# 17-0546-cv

# United States Court of Appeals

*for the*

# Second Circuit

KEVIN FLOOD, individually and on behalf of all others similarly situated, ABIGAIL WILTZ, YALONTYA SIMMONS, WILLIAM PROCTOR, VICTOR GREEN, AKIL MATAS, ANDREW GUGINO, ANDREW WILLIAMS, BERNARD BECKER, BRENDAN O'MALLEY, CHEDELINE DECIUS, CHERYL ROOT, CHRISTOPHER STRINGHAM, AESHA JOHNSON, ALIBIN DRAYTON, CONRAD CAMPBELL, BRYAN POPPENGER, DARYL POST, DAVID SAROFF, MICHAEL A. JOHNSON, CHRISTINE BURNS,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

SHANNON KATHLEEN PATTON
LITTLER MENDELSON, P.C.
1100 Superior Avenue East, 20th Floor
Cleveland, Ohio 44114
(216) 696-7600

BRADLEY A. SHERMAN
SHERMAN BOSEMAN LEGAL GROUP
800 West St. Clair Avenue, 4th Floor
Cleveland, Ohio York 44113
(216) 647-1070

IVAN ROSS NOVICH
LITTLER MENDELSON, P.C.
One Newark Center
1085 Raymond Boulevard, 8th Floor
Newark, New Jersey 07102
(973) 848-4700

*Attorneys for Defendants-Appellees*

DONETTE KINGSTON, DWIGHT FORBES, FANTASIA CLARK, CHUNSEY BRAMLETT, FLOYD MAYO, HEIDI MINER, HOWARD HEARD, JR., JACOB OYEBAMIJI, JAMES BAKER, III, JAMES FRALIX, JASON DARDEN, JASON RUSSELL, JAYMIE CARPENTER, JEAN PHANOR, JERMAIN ALBERGA, JORDAN MITCHELL, JOSEPH DANIAL, JOSEPH BOBB, JR., JOSEPH FIATO, JUSTIN NUNEZ, KARIN CALHOUN, KENNETH HOFFMAN, LUKE BIGGINS, MARI-LOUISE MERKWA, MARY JO CARROLL, MICHAEL SLISH, MILANDRO GENCIANA, NATHAN ADAMS, NEIL TELESFORD, NICHOLAS BARBATO, OMAR NIASSE, PRINTA DORROUGH, ROBERT DePROSPERO, ROXANNE KNOX, RUNEY MAH, RYAN McMANUS, SASIYA DAVIS, SHANE MENNIG, SUE PROM, TAMARAH TEAGUE, TAVARAS RICHARDSON, THERESA BREX, TOCHUKWU EZEAGWUNA, TOMMY HAYWOOD, COREY BREWER, EDWIN M. RIVERA, JR., HUSEIN ROBINSON, JENERY GONZALEZ, TYSTFYR BUTLER, ADRIAN MAPP, AKILAH CHANDER, ALBERTINA WINSTEAD, ANTHONY THOMPSON, BERNARD ULEANO, BRIAN MAHON, BRYAN K. SMITH, JR., CARLOS DE LOS SANTOS, CARLOS HODGSON, CARRIE ANN KUST, CHAD SIMMONS, CHRISTINE JONES, DaNAY WALKER, DANZALE ELSTON, DARYL GILLIAM, DAVID PRAGEL, DAVON BATES, DEMETRIE BROWN, DORCAS ROSA, GAIUS DIPIGNEY, GARRICK AVERA, GERARD JEFFERSON, GINA DiFILIPPI, GREGORY BRAINARD, GREGORY MATURANO, GREGORY MITCHELL, HORACE FRANCIS, JESSYCA BERROA, JOHNNY OLIVER, JONATHAN EBERLEIN, JONATHAN ROSS, JORDAN URBANSKI, KEITH MacDONALD, KENNETH JOHNSON, KHALID HAMIDEH, La'TRICE T. PURDIE, MARCELL ECCLES, MARISOL TAVARES, MARTIN ENDERS, MATTHEW MORALES, MICHAEL PIERRE, MILTON FLOOD, NASIBA BAIMATOWA, NORMAN JOHNSON, OSKAR RODRIGUEZ, PATRICK RUDA, RAHEEM REDDICK, RAYMOND BROWN, ROCIO VELAZQUEZ, RUSSELL MARTINA, TERRANCE HARDY, TYMONT PATTON, WILLIAM PORTER, BRABIM HAMAL, BYRON RESPRESS, DARIUS FORREST, ELIZABETH MARIE TERRY, INGRID COTTERELL INGRAM, JARIEMELLE RIVERA, ALEX MOTHERSELL, ALEXANDER CAIELLO, BRANDON MEANS, DAYQUAN JOHNSON, JAION HYMAN, JENNIFER ZELASKI, ROBERTO FLORES, TRUDY NUNAN HOBAICHAN, VICTORIA GREEN, AHMAD AMIN, ASHLEY WOLFE, CORTEZ CROSS, CRYSTAL WHITE, DAQUAN FOSTER, DEMETRIUS HARVIN, DENISE LENNON, EMMANUELLA PIERRE-TOUSSAINT, JOHN KORNICHAK, JOHN MONAHAN, JUAN LOPEZ, KHALDWN EL-FARES, KRISHA PRUNIER, LISA CHIN, LUCINDA KAPTUR, MICHAEL KIRCHMYER, MONTE'WELL GODLEY, NATHANIEL BRAY, SHERMAN WALKER, STEPHEN MARCONI, TAMEA DIXON, TIENTCHEU LAMBERT, WAYLON STEWART, AHMAD DAVIS, CHANTALE DURAND, DILAN MICHAEL BOND, MARGARET OFIKWU, RONALD WILLIAM, DANTE GUTIERREZ, GARY SCHUELER, JOSHUA VINCENT, SCOTT WILLIAMS,

*Plaintiffs-Appellants,*

– v. –

JUST ENERGY MARKETING CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY GROUP INC.,

*Defendants-Appellees.*

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Defendants-Appellees Just Energy Marketing Corporation, Just Energy New York Corp., and Just Energy Group, Inc. ("Just Energy") disclose that Just Energy Group, Inc. is a publicly traded corporation and the parent company of the other two named Defendants-Appellees. There are no other publicly traded entities with a financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

**PAGE**


STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

I. STATEMENT OF FACTS .......... 2

A. Flood Joined Just Energy Marketing Corporation as a Door-to-Door Salesman to Solicit New Customers and to Obtain Contracts for Just Energy New York's Gas and Electricity Services .......... 2

1. Flood's Engagement with Just Energy .......... 2

2. Orientation and Ongoing Sales Training .......... 4

3. Interaction With Residential Customers .......... 5

4. The Verification Call/Wrap Up .......... 7

5. Flood Was Compensated on a Commission Basis for Every Successful Contract He Obtained .......... 7

B. Just Energy Never Arbitrarily Rejected Any Contracts, It Paid Flood All Commissions Due to Him .......... 8

II. PROCEDURAL HISTORY .......... 11

SUMMARY OF ARGUMENT .......... 13

ARGUMENT .......... 17

I. STANDARD OF REVIEW .......... 17

II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO JUST ENERGY BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT FLOOD'S PRIMARY DUTY WAS TO MAKE SALES OR TO OBTAIN ORDERS OR CONTRACTS FOR SERVICES WITHIN THE MEANING OF THE OUTSIDE SALES EXEMPTION .......... 18

**TABLE OF CONTENTS**
(CONTINUED)

**PAGE**

A. Flood Was Customarily and Regularly Engaged Away from Just Energy's Place of Business ........ 19

B. Flood's Primary Duty Was to "Make Sales or Obtain Orders or Contracts" Within the Meaning of the Outside Sales Exemption ...... 19

C. External Indicia of Sales Also Support the District Court's Finding that Flood Was an Exempt Outside Salesperson ........ 22

1. Just Energy Need Not Satisfy All the External Indicia of Outside Sales for the Exemption to Apply ........ 22

2. The District Court Correctly Concluded That Flood Bore Most of the Indicia of Outside Sales and the Rest Were, At Most, Neutral ........ 25

a. Flood Was Paid on a Commission Basis ........ 26

b. Flood Solicited New Business for Just Energy ........ 26

c. Flood Was Afforded Sales Training ........ 27

d. Flood Had Prior Sales Experience ........ 28

e. The Degree of Control Just Energy Exercised Over Flood Was Not Inconsistent With – and Did Not Defeat – the Outside Sales Exemption ........ 29

D. The Law Does Not Require that an Outside Salesperson Have Authority to Bind the Company or Finalize A Sale for the Outside Sales Exemption to Apply ........ 35

III. THE DISTRICT COURT CORRECTLY RULED THAT ISSUE PRECLUSION DID NOT BAR AN AWARD OF SUMMARY JUDGMENT TO JUST ENERGY ........ 44

A. The Jury's Liability Finding in *Hurt* Is Not a "Final Judgment." ...... 45

B. Other Inconsistent District Court Rulings Preclude Application of Collateral Estoppel ........ 48

## TABLE OF CONTENTS
(CONTINUED)

**PAGE**

IV. THE DISTRICT COURT APPROPRIATELY DISMISSED COUNT III OF FLOOD'S COMPLAINT WHERE HE WAS FOUND TO BE AN EXEMPT OUTSIDE SALESMAN AND WHERE HE OFFERED NO FACTS THAT JUST ENERGY FAILED TO PAY COMMISSIONS OWED ....................................................................50

CONCLUSION ....................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Chicago Park Dist.*,
773 F.2d 850 (7th Cir. 1985), *cert. denied,* 475 U.S. 1095 (1986) .............47, 48

*Ali v. Mukasey*,
529 F.3d 478 (2d Cir. 2008) ....................................................................45

*Amendola v. Bristol-Myers Squibb Co.*,
558 F.Supp.2d 459 (S.D.N.Y. 2008) ......................................................23

*In re American Express Anti-Steering Rules Antitrust Litigation*,
2016 U.S. Dist. LEXIS 3332 (E.D.N.Y. Jan. 7, 2016) ................................44, 47

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................17

*Avondale Shipyards, Inc. v. Insured Lloyd's*,
786 F.2d 1265 (5th Cir. 1986) .................................................................47

*Barnick v. Wyeth*,
522 F.Supp.2d 1257 (C.D. Cal. 2007) .....................................................40

*Baum v. AstraZeneca*,
605 F.Supp.2d 669 (W.D. Pa. 2009), *aff'd,* 372 Fed. Appx. 246
(3rd Cir.), *cert. denied,* 562 U.S. 896 (2010) ...........................................*passim*

*Beck v. Levering*,
947 F.2d 639 (2d Cir. 1991) ....................................................................44

*Brody v. AstraZeneca Pharmaceuticals, LP*,
2008 WL 6953957 (C.D. Cal. June 11, 2008)...........................................36

*Caminetti v. U.S.*,
242 U.S. 470 (1917)..................................................................................20

*Chenensky v. New York Life Ins. Co.*,
2009 U.S. Dist. LEXIS 119549 (S.D.N.Y. Dec. 22, 2009) .......................... 18, 23

*Christopher v. SmithKline Beecham Corp.*,
132 S.Ct. 2156 (2012) ............................................................................ *passim*

*Clements v. Serco, Inc.*,
530 F.3d 1224 (10th Cir. 2008) ........................................................... 38, 41, 42

*Dailey v. Just Energy Marketing Corp.*,
2015 U.S. Dist. LEXIS 97103 (N.D. Cal. July 23, 2015) .......................... *passim*

*Dempsey v. Nat'l Enquirer*,
702 F.Supp. 927 (D. Me. 1988) .................................................................. 48

*Gelb v. Royal Globe Ins. Co.*,
798 F.2d 38 (2d Cir. 1986), *cert. denied*, 480 U.S. 948 (1987) ......................... 46

*Gold v. New York Life Ins. Co.*,
730 F.3d 137 (2d Cir. 2013) ...................................................................... 19

*Hantz v. Prospect Mortgage, LLC*,
11 F.Supp.3d 612 (E.D. Va. 2014) ............................................................. 24

*Harrison v. Celotex*,
583 F.Supp. 1497 (E.D. Tenn. 1984) .......................................................... 50

*Hoppe v. G.D. Searle & Co.*,
779 F. Supp. 1425 (S.D.N.Y. 1991) ........................................................... 49

*Hudson Energy Servs., LLC v. A&P (In re: A&P)*,
498 BR 19 (S.D.N.Y. Sept. 16, 2013) ....................................................... 22

*Hurt v. Commerce Energy, et al.*,
Case No. 12-CV-00758 (N.D. Ohio) ....................................................... *passim*

*Icicle Seafoods, Inc. v. Worthington*,
475 U.S. 709 (1986) ................................................................................... 18

*Jack Faucett Associates v. American Tel. & Tel. Co.*,
744 F. 2d 118 (D.C. Cir. 1984) .................................................................. 49

*Jewel Tea Co. v. Williams*,
118 F.2d 202 (10th Cir. 1941) ....................................................................30

*LaBuhn v. Bulkmatic Transport Co.*,
865 F.2d 119 (7th Cir. 1988) ......................................................................46

*Lane v. Humana Marketpoint, Inc.*
2011 U.S. Dist. LEXIS 59608 (D. Idaho June 3, 2011) .........................24, 32, 34

*Loeffler v. Staten Island Univ. Hosp.*,
582 F.3d 268 (2d Cir. 2009) ........................................................................17

*Lummus Co. v. Commonwealth Oil Refining Co.*,
297 F.2d 80 (2d Cir. 1961) ..........................................................................45

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)......................................................................................17

*Mazzei v. Abbott Labs. & Co.*,
2012 U.S. Dist. LEXIS 46404 (E.D.N.Y. Mar. 13, 2012).................................47

*Nielsen v. DeVry, Inc.*,
302 F.Supp.2d 747 (W.D. Mich. 2003) ...................................................*passim*

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
163 F.3d 153 (2d Cir. 1998) ........................................................................22

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)..................................................................17, 44, 48, 49

*PenneCom B.V. v. Merrill Lynch & Co.*,
372 F.3d 488 (2d Cir. 2004) ........................................................................44

*Schaefer-Larose v. Eli Lilly and Co.*,
663 F.Supp.2d 674 (S.D. Ind. Sept. 29, 2009), *aff'd*, 679 F.3d 560
(7th Cir. 2012).................................................................24, 31, 34, 38

*Scott v. Harris*,
550 U.S. 372 (2007)......................................................................................17

*Setter v. A.H. Robins Co.*,
748 F.2d 1328 (8th Cir. 1984) ......................................................................49

*Simas v. Merrill Corp.*,
2004 U.S. Dist. LEXIS 1415 (S.D.N.Y. Jan. 29, 2004) ....................................52

*Slow v. Prestige Merchandising Co., Inc.*,
2011 U.S. Dist. LEXIS 105517 (E.D.N.Y. Sept. 19, 2011) ...............................37

*Tretter v. Johns-Manville Corp.*,
88 F.R.D. 329 (E.D. Mo. 1980) .........................................................................50

*United States v. Consol. Edison Co.*,
590 F.Supp. 266 (S.D.N.Y. 1984) ....................................................................22

*Vinole v. Countrywide Home Loans, Inc.*,
246 F.R.D. 637 (S.D. Cal. 2007), *aff'd,* 571 F.3d 935 (9th Cir.
2009) ................................................................................................................49

*Warner/Elektra/Atlantic Corp. v. County of DuPage*,
991 F.2d 1280 (7th Cir. 1993) ..........................................................................46

*Wilkins v. Just Energy Group, Inc.*,
308 F.R.D. 170 (N.D. Ill. 2015)...........................................................26, 40, 43

*Wirtz v. Keystone Readers Serv., Inc.*,
418 F.2d 249 (5th Cir. 1969) ..........................................................40, 41, 42

**Statutes**

28 U.S.C. §1291 ...........................................................................................45, 47

29 U.S.C. §203(k) ..................................................................................................19

29 U.S.C. §216(b) ..................................................................................................11

FLSA Section 3(k) .................................................................................................18

N.Y. Gen. Bus. Law §349-d ..................................................................................22

**Other Authorities**

29 C.F.R. §§541.500(a)(1)-(2), 541.501(a) .........................................................19

29 C.F.R. §541.501(b) ............................................................................................19

29 C.F.R. §541.501(c)..............................................................................................19

29 C.F.R. §541.501(d) ....................................................................................20

29 C.F.R. §541.502 ..........................................................................................19

12 NYCRR §§142-2.2, 142-2.14(c)(5) ...............................................................19

Fed. R. Civ. P. 23 ............................................................................................11

Fed. R. Civ. P. 54(b) ...................................................................................47, 48

Fed. R. Civ. P. 56(c).........................................................................................17

Fed. R. Civ. P. 56.1 ..........................................................................................12

## STATEMENT OF THE ISSUES

1. Whether the district court properly granted summary judgment in favor of Just Energy on the grounds that Flood's primary job duty was "making sales or obtaining orders or contracts for services" within the meaning of the outside sales exemption to the Fair Labor Standards Act (FLSA) and New York Labor Law (NYLL), where the undisputed facts established that Flood's core job duties included knocking on doors in residential areas, interacting with potential customers, and explaining Just Energy's products and services, in an effort to persuade those people to sign contracts to obtain their gas and electricity services from Just Energy.

2. Whether the district court correctly held that the doctrine of issue preclusion did not bar an award of summary judgment to Just Energy where the facts of this case were not litigated in *Hurt v. Commerce Energy, et al.,* Case No. 12-CV-00758 (N.D. Ohio); the jury instructions in *Hurt* deviated from Second Circuit law on "making sales;" the jury in *Hurt* did not consider whether those plaintiffs "obtained orders for contracts or services" under the FLSA and/or NYLL; there has been no final judgment yet in *Hurt*; and where *Hurt* conflicts with another federal court, which previously found the outside sales exemption applied. *See Dailey v. Just Energy Marketing Corp.,* 2015 U.S. Dist. LEXIS 97103 (N.D. Cal. July 23, 2015).

3. Whether the district court correctly granted summary judgment to Just Energy and dismissed Flood's claim for failure to timely pay wages under the NYLL, where the court rightly found that Flood is an outside salesman not entitled to minimum wage and overtime under applicable exemptions; where Flood's claim that commissions were improperly withheld or clawed back was entirely speculative; and he could not identify any specific customer contracts for which he was not properly paid commission.

# STATEMENT OF THE CASE

## I. STATEMENT OF FACTS

### A. Flood Joined Just Energy Marketing Corporation as a Door-to-Door Salesman to Solicit New Customers and to Obtain Contracts for Just Energy New York's Gas and Electricity Services.

#### 1. Flood's Engagement with Just Energy.

Appellee Just Energy Group, Inc. ("JEG") is a Canadian for-profit corporation and the parent corporation of Appellees Just Energy Marketing Corporation ("JEMC") and Just Energy New York Corporation. JA000037, JA 000090. JEMC markets and sells natural gas and electricity to residential and commercial customers on behalf of Just Energy New York, the actual supplier of gas and electricity services. JA000037, JA000090.

Appellant Flood (and the opt-in plaintiffs) engaged with JEMC to go door-to-door to solicit customers and sell Just Energy New York Corporation's energy

products and services. JA000037-38, JA000090, JA000250. At the outset of his engagement with Just Energy, Flood signed an Agreement, providing that "JEMC has been retained by [Just Energy New York Corp.] to assist [Just Energy New York Corp.] in *obtaining energy contracts ("Contracts") from consumers* . . .. JEMC has developed a door to door solicitation program designed to *obtain Contracts* for the benefit of [Just Energy New York Corp.]." JA000244-46, JA002197-99, JA002267 (emphasis added). The Agreement specifically contemplated that Flood would be responsible for – and have the authority to – enter into *contracts* with customers: "The Contractor shall have no authority whatsoever to enter into any agreements of any kind on behalf of JEMC or [Just Energy New York Corp.] *other than to enter into Contracts with customers.*" JA002267 (emphasis added). Further, the Agreement provided that Flood was engaged "in the business of selling (or soliciting the sale of) consumer products (natural gas and electricity)" and that he was expected to turn in completed contracts each week. JA002267-68.

When Flood became engaged with JEMC, he understood that the job entailed selling energy door-to-door. JA000250, JA000252. He sold "brown" or "green" (environmentally friendly) energy to customers. JA000307-09.

Flood, who had prior sales experience selling insurance and other financial services before joining Just Energy JA000208-09; JA000212-16, JA000415),

readily characterized his work as "sales" and described himself as a "salesperson:"

> Q. If I were to tell you you were not a salesperson, you were not doing sales, would you agree with me?
>
> A. No.
>
> Q. Why not?
>
> A. Because that's what I do.

JA000415.

**2. Orientation and Ongoing Sales Training.**

During his time with Just Energy, Flood received initial and ongoing sales training. At the outset, Flood attended an orientation session, covering background about the Company and the energy industry, as well as sales techniques. JA000039, JA000044, JA000090, JA000092, JA000251-59, JA000271-72. During that orientation, Flood learned about the company and the opportunity the position offered. JA000251-52. He was also provided a script and a code of ethics and conduct. JA000256-57. After orientation, Flood shadowed another salesperson in the field before he began to knock on doors on his own. JA000254-55. In addition to the orientation, Flood typically attended morning training meetings at Just Energy's sales office. JA000279. Throughout his time with Just Energy, Flood received tips on how to be a better salesperson and he often provided tips to others on how to be a better salesperson. JA000271-72.

### 3. Interaction With Residential Customers.

While Flood typically began his work day at Just Energy's sales office participating in the meetings described above, it is undisputed that he spent approximately 75-80% of his time away from the office, working in the field, going door-to-door soliciting potential customers to sign contracts with Just Energy. JA000414-15. Flood typically traveled out to the field in a van with other door-to-door salespeople to knock on doors in residential neighborhoods typically selected by a crew coordinator or regional distributor on behalf of Just Energy. JA000231, JA000280-81, JA000319.

Indeed, Flood's own characterization of his work in his opening brief acknowledges this unassailable fact: "Plaintiffs went door-to-door trying to get people to sign applications to potentially become Just Energy's customers." Brief of Appellant at 9. The "applications" Flood obtained were conspicuously entitled "Customer Agreement" and plainly were contracts for the provision of gas and electricity services, complete with a "Customer Disclosure Statement" outlining "Essential Agreement Information" whereby the customer – or "buyer" – "agree[s] to buy natural gas and CEOgas (if selected) from USES at the Price and Term set out below" in the Agreement and "agree[s] to initiate commodity service and begin

enrollment" with the Company. JA2573-74.[1] Below some additional terms – including provisions regarding late payment of fees, the term of the agreement, early cancellation, as well as a budget billing option and the customer's right to cancel – is a line for the customer's signature. *Id.* Plaintiff's goal, of course, was to persuade the customer to select Just Energy as its gas supplier and get the customer's commitment to buy gas from Just Energy by obtaining the customer's signature on the agreement.

Specifically, when Flood met with a customer at the door, he would identify himself, the company he represented (making clear it was not the utility company per applicable regulatory guidelines) and why he was there; he would do this in order to explain Just Energy's services and value, as well as to solicit the resident to become a customer of Just Energy. JA000294. Flood explained the qualities that one must possess to be a good salesperson: "[Y]ou need to project a certain amount of skill, a certain amount of expertise, and you must be able to relate to people and you must be honest…You have to know your product and your business…you need to sell the product that [the customers] need." JA000218-20.

In that regard, Just Energy provided a script for Flood to use as a guideline in interacting with customers and making sales. JA000273-75, JA000392,

[1] The Agreement contained at JA2573-74 is a version of the customer agreement utilized by U.S. Energy Savings Corp., a predecessor to Just Energy. There is no dispute that this sample is a fair representation of the various customer agreements Just Energy utilized during the relevant time period.

JA002284-86. Flood "added" to the script during his sales calls, going into a level of detail not contained in the script. JA000301, JA000304. For instance, he showed customers a bar graph that was not part of the script, explaining that it was "a good sales tool" that helped him educate people. JA000301-02, JA000304, JA000315-16, JA000391-92. Plaintiff also showed customers Just Energy brochures, describing the script as the "intro" and the brochure as the "visual." JA000390-91.

#### 4. The Verification Call/Wrap Up.

After Flood convinced a customer to sign a contract for Just Energy New York's services, the customer completed a telephone verification call with a third-party, designed to prevent fraud and to ensure that the customer understood the contract terms. JA000040, JA000091, JA000372-73. Importantly, the third-party verifier was not a Just Energy employee, did not sell anything to the customer, and could not even answer any customer questions. JA000372-73, JA000414-15. Flood was "the last salesperson to touch the customer." JA000415, JA000447.

#### 5. Flood Was Compensated on a Commission Basis for Every Successful Contract He Obtained.

Flood worked for Just Energy from September 2011 through November 2014, or approximately 40 months. JA000160-JA000163. During that time, Flood worked to attain certain sales goals – some of which he set for himself, and some of which were set by the Company, or by a regional distributor by way of a contest

to incentivize door-to-door salespeople to increase their sales. JA000157-160, JA000289-92. Although he did not always meet his goals, Flood never received any discipline for failing to do so. JA000394. Motivated to work, Flood recognized on his own that if he did not work, he would not make any sales or be compensated. JA000169-70, JA000234.

Flood's compensation was 100% commission based. JA000041-45, JA000252. He also could earn reconciliation and residual payments on behalf of customers who stayed with Just Energy New York for a certain length of time. JA000357-59, JA000365, JA000631-34. Flood described himself as a "top producer;" indeed, he earned upwards of $70,000 per year in 2012 and 2013. JA000162, JA000354. In addition, he often qualified for incentives and awards, including trips to London, the Dominican Republic, Ireland, Scotland, and Hawaii. JA000162-63. Flood testified that he obtained in excess of 8,000 new contracts during his time with Just Energy – approximately 2,000 to 2,500 new accounts per year, or an average of 50 new accounts per week. JA000162-63, JA000287-88.

### B. Just Energy Never Arbitrarily Rejected Any Contracts, It Paid Flood All Commissions Due to Him.

As Flood unequivocally testified, he worked as a salesman, soliciting residential customers to sign contracts with Just Energy. JA000415. He directly engaged with his customers as the last and only salesperson on behalf of JEMC. JA000415, JA000447. Yet, in an effort to avoid the plain and unmistakable

language and meaning of the exemption as embodied in the statute and regulations, Flood argues that he could not actually obtain a contract because Just Energy retained discretion to reject or to accept a contract. Brief of Appellant at 32-34.

As with any contract or sale in virtually any industry, the contracts that Flood and other salespeople obtained could be subject to cancellation for any number of reasons. But, as Flood admitted, none of these reasons resulted from the arbitrary exercise of discretion by Just Energy. JA000381, JA000447. For instance, if the third-party verifier could not verify the customer's information, the sale would not go through. JA000374. Likewise, the customer could simply change his mind and cancel. JA000376-77. By way of additional examples, some residential customers placed a "slam block" on their utility accounts to prevent companies like Just Energy New York from being placed on their account without permission and, if the customer failed to remove the "slam block" after signing the contract with Just Energy, the contract might not become effective. JA000381-83. Likewise, the utility company might occasionally disqualify a customer for credit reasons. JA000380.

Critically, Flood could not identify any situation in which Just Energy arbitrarily rejected a sale. JA000381, JA000447. To the contrary, he testified that Just Energy wants to generate new business from new customers and he could not think of a reason why any contracts would be arbitrarily rejected. *Id.* Although he

asserts in his brief that "one in twenty of the contracts he submitted to [Just Energy] were arbitrarily rejected," (Brief of Appellant at 19, *citing* JA000380), that statement is not supported by the record. What Flood actually testified to in his deposition was that "once in a while" the utility company might disqualify a customer if the customer had "a huge balance," but he estimated that might occur only "one in twenty" times. JA000380.

Flood also tries to distance himself from critical admissions by asserting – without any evidentiary support – that Just Energy neglected to properly pay him commissions on certain contracts he submitted. However, Flood's assertion is based on his mere speculation that Just Energy clawed back or otherwise did not pay commissions on certain contracts after Just Energy discontinued a specific "Predict-a-Bill" program. JA000317-19. Critically, he did not and cannot identify a single, specific instance in which Just Energy did not pay him a commission where owed – he admitted that he did not keep records and has no proof of any unpaid commissions. JA000317-19, JA000372, JA2904. As Flood admitted in his deposition, when asked what evidence he could point to establishing that Just Energy disqualified customers and retained his commissions, Flood stated, "How would I prove that? I don't know." JA000318.

## II. PROCEDURAL HISTORY

Flood filed his Complaint in the United States District Court for the Southern District of New York, alleging that he was not paid minimum wage and overtime in violation of the FLSA and NYLL. JA000035-87. Just Energy answered and asserted, among other things, that Flood was exempt from minimum wage and overtime as an outside salesperson. JA000088-103.

Flood quickly moved for conditional certification of the FLSA claims pursuant to 29 U.S.C. §216(b). JA000022. Given the low threshold for conditional certification, the district court granted the motion and authorized notice to potential class members. JA000026-27. Approximately 168 individuals opted in. JA000023-33.

After discovery, Just Energy moved for summary judgment on the grounds that Flood was exempt from the minimum wage and overtime requirements of the FLSA and NYLL as an outside salesperson. JA000025, JA002106-66. Specifically, Just Energy argued that Flood was engaged to "make sales or obtain orders or contracts" for Just Energy's gas and electricity services. *Id.*

While Just Energy's motion for summary judgment was pending, Flood also moved the district court to certify the case as a class action under Fed. R. Civ. P. 23. JA000032. Just Energy opposed the motion. JA000033.

On January 20, 2017, the district court awarded summary judgment in Just Energy's favor, finding that Flood was an exempt outside salesperson whose primary duty was to make sales or obtain orders or contracts for services, and denied the motion for class certification as moot.[2] JA000033-34, JA002895-2912. Specifically, in rejecting Flood's arguments in opposition, the district court reasoned that Flood was engaged to obtain contracts for Just Energy's gas and electricity services, and, despite his arguments to the contrary, "nothing in the FLSA or NYLL limits the definition of an outside salesperson to someone who has the unfettered discretion to finalize a binding sale." JA002905. The court also concluded that Flood bore many of the external indicia of outside sales: he earned commissions; he primarily worked in the field away from Just Energy's office; and he was provided with sales training. JA002906.

In granting summary judgment to Flood, the district court invited any opt-in plaintiffs who did not believe they were similarly situated to Flood to file a Rule 56.1 statement of facts setting forth reasons why they should be distinguished. JA002911. None of the opt-in plaintiffs did so and, accordingly, summary judgment was entered as to all opt-in plaintiffs. JA000034. Shortly afterward, Flood filed his Notice of Appeal. JA002926.

[2] Flood and the opt-in plaintiffs are not appealing the denial of class certification.

## SUMMARY OF ARGUMENT

The district court properly awarded summary judgment to Just Energy, finding that Flood was primarily engaged away from Just Energy's place of business to make sales or to obtain orders or contracts for services. There is no dispute that Flood was responsible for knocking on doors in residential neighborhoods to solicit new customers; specifically, he wanted them to sign contracts to obtain their gas and electricity services from Just Energy New York. Moreover, Flood readily characterized himself as a "salesman" and he bore other external indicia of exempt outside salespeople. He was indisputably responsible for garnering new business for Just Energy, and his commission-based compensation was entirely dependent on his sales efforts. He was paid a commission for every successful customer contract he submitted, and he was further eligible to earn additional, residual commissions if customers he obtained remained with Just Energy beyond a certain length of time. Flood brought a wealth of previous sales experience to his role (although it was not strictly required) and he was provided with initial and ongoing sales training during his engagement with Just Energy.

Just Energy admittedly exercised some level of control and direction over Flood's sales activities. We accept as true, as we must, for purposes of summary judgment only, that Flood was expected to work certain hours and days; that he

was assigned specific areas or neighborhoods in which to knock on doors; that he was provided with Just Energy marketing materials; and that he was expected to comply with certain ethical and conduct standards. However, these are not relevant to – nor inconsistent with – the outside sales exemption, particularly considering that Flood met individually with customers and no other representative of Just Energy even spoke with his customers, much less engaged in any other sales efforts in furtherance of obtaining contracts.

Flood argues for a tortured reading of the statutory and regulatory language. Specifically, he claims he could not have been engaged in outside sales because he did not have the ultimate authority to "finalize" the contract or bind Just Energy. Yet Flood exalts form over substance. Customer contracts could be subject to cancellation for a variety of reasons, but that does not alter the fundamental nature of the work he performed – namely, soliciting customers to make sales and to obtain contracts.

Likewise, the district court correctly held that collateral estoppel does not apply based on rulings in ongoing litigation in a federal court in Ohio. Although similar issues are being litigated in the *Hurt* case, *Hurt* does not involve the specific facts of *this* case, nor has there been a final, appealable judgment entered, precluding application of collateral estoppel. Moreover, the jury instructions in *Hurt* deviated from Second Circuit law on "making sales," and the *Hurt* jury did

not even consider whether those plaintiffs "obtained orders or contracts for services" under the FLSA and/or NYLL. By sharp contrast, this key issue was central to the district court's ruling in the present case.

In finding that collateral estoppel did not apply, the district court also correctly reasoned that if it were to apply, Just Energy would have just as strong – if not a stronger – argument for issue preclusion based on the decision of the district court in California in *Dailey v. Just Energy Marketing Group,* 2015 U.S. Dist. LEXIS 97103 (N.D. Cal. July 23, 2015). There, the district court also found that workers engaged in going door-to-door to solicit new customers for Just Energy "obtained contracts for services" and, therefore, were exempt from the law's minimum wage and overtime requirements as outside salespeople. As *Dailey* resulted in a final judgment, the district court correctly reasoned that not only might Just Energy be the party with a plausible argument for issue preclusion, Flood could not invoke collateral estoppel to "cherry pick" amongst rulings that are favorable to him, while ignoring rulings that are not.

Finally, there is no merit to Flood's belated contention that his lawsuit was about untimely payment of commissions, rather than minimum wage and overtime. The district court appropriately dismissed Count III of his complaint because Flood's complaint was clearly about allegedly unpaid minimum wage and overtime, and as an exempt outside salesperson, Flood had no claim for minimum

wage and overtime. Flood, who did not even plead the applicable statute, did not specifically plead that Just Energy improperly withheld or clawed back commissions, nor did he argue it in his opposition to Just Energy's motion for summary judgment.

Even if Count III of Flood's Complaint could be read as anything more than a claim for failure to properly pay minimum wage and overtime and be construed as a claim for unpaid commissions, the record is devoid of any evidence that Just Energy failed to pay any commissions owed or improperly clawed back paid commissions. Flood merely speculated that Just Energy did not pay commissions on a particular program – "Predict-A-Bill" – after it chose to discontinue the program and customers no longer qualified. The district court correctly noted that Flood's testimony in this regard was wholly speculative and that he could not identify with any specificity a single contract on which he was not properly paid the commission owed. On these facts, the district court properly dismissed Count III of the complaint.

Accordingly, the district court properly awarded summary judgment to Just Energy on all counts.

# **ARGUMENT**

## I. **STANDARD OF REVIEW**

The district court's decision not to employ the doctrine of collateral estoppel against Just Energy based on the *Hurt* decision is subject to reversal only if this Court finds that the district judge abused her discretion. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). Further, the district court's award of summary judgment is subject to a *de novo* standard of review. Accordingly, summary judgment is warranted where there is no disputed issue of material fact in the record so that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Loeffler v. Staten Island Univ. Hosp.,* 582 F.3d 268, 274 (2d Cir. 2009); Fed. R. Civ. P. 56(c). Where the movant has shown that there is no genuine issue of material fact, the non-movant cannot rely on a mere scintilla of evidence, but must set forth "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Applying these standards, the district court correctly held that there were no genuine of issues of material fact requiring trial. Where, as here, the question of

how a plaintiff spent his time working is not disputed, whether those activities exempt him from the FLSA is a question of law and well-suited for resolution on summary judgment. *Chenensky v. New York Life Ins. Co.,* 2009 U.S. Dist. LEXIS 119549, *12 (S.D.N.Y. Dec. 22, 2009), *citing Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Just Energy satisfied its summary judgment burden of establishing that there were no genuine of issues of material fact; Flood spent his time going door-to-door persuading potential customers to sign contracts to purchase their gas and electricity from Just Energy. The district court correctly concluded that Flood was primarily engaged to obtain orders or contracts for services and, accordingly, was exempt, as a matter of law, from the minimum wage and overtime requirements of the FLSA and NYLL.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO JUST ENERGY BECAUSE THE UNDISPUTED MATERIAL FACTS ESTABLISH THAT FLOOD'S PRIMARY DUTY WAS TO MAKE SALES OR TO OBTAIN ORDERS OR CONTRACTS FOR SERVICES WITHIN THE MEANING OF THE OUTSIDE SALES EXEMPTION.

Just Energy carried its burden and established that there was no genuine dispute of material fact that Flood's job duties fell within the scope of the outside sales exemptions under the FLSA and NYLL. An exempt "outside salesman" is any employee whose primary duty is (1) "making sales" within the meaning of section 3(k) of the FLSA or "obtaining orders or contracts for services" and (2) who is customarily and regularly engaged away from the employer's place of

business.[3] 29 C.F.R. §§541.500(a)(1)-(2), 541.501(a).

### A. Flood Was Customarily and Regularly Engaged Away from Just Energy's Place of Business.

"The outside sales employee is an employee who makes sales at the customer's place of business or, *if selling door-to-door, at the customer's home.*" 29 C.F.R. §541.502 (emphasis added). Flood concedes that he was customarily and regularly engaged away from Just Energy's place of business. JA000414-15. Flood admittedly spent 75-80% of his time in the field knocking on prospective customers' doors. *Id.* Thus, the only question is whether his activities were aimed at making sales or obtaining contracts for services. The answer to this question is a resounding "yes."

### B. Flood's Primary Duty Was to "Make Sales or Obtain Orders or Contracts" Within the Meaning of the Outside Sales Exemption.

The FLSA broadly provides that the terms "sales" and "sell" mean and include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. §203(k); *see also* 29 C.F.R. §541.501(b). Exempt outside sales work includes "not only the sale of commodities, but also *obtaining orders or contracts for services*…" 29 C.F.R. §541.501(c) (emphasis added). "The word 'services' extends the outside sales exemption to employees

---

[3] New York's version of the exemption does not meaningfully differ from the federal standard and it is well-settled that New York's exemption is defined and applied in the same manner as the FLSA. 12 NYCRR §§142-2.2, 142-2.14(c)(5); *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 145 (2d Cir. 2013).

who sell or take orders for a service, which may be performed for the customer by someone other than the person taking the order." 29 C.F.R. §541.501(d).

In broadening the outside sales exemption, the United States Supreme Court noted that the FLSA's definition of "sale" is "more expansive than the term's ordinary meaning." *Christopher v. SmithKline Beecham Corp.,* 132 S.Ct. 2156, 2171, n.18 (2012). When applying the outside sales exemption, courts are charged with employing "common sense" in reviewing the "straightforward construction" of the applicable statute and regulation when assessing the undisputed facts. *Baum v. AstraZeneca,* 605 F.Supp.2d 669, 676 (W.D. Pa. 2009), *aff'd,* 372 Fed. Appx. 246 (3rd Cir.), *cert. denied,* 562 U.S. 896 (2010). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain…the sole function of the courts is to enforce it according to its terms." *Caminetti v. U.S.,* 242 U.S. 470, 485 (1917).

The Supreme Court has adhered to this functional, common sense approach, instructing that the FLSA "exempts anyone 'employed…*in the capacity* of [an] outside salesman.' In this sense, 'capacity' means an '[o]utward condition or circumstances; relation; character; position.' By emphasizing 'capacity' of the employee, the Act counsels in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works." *Christopher,* 132 S.Ct. at 2170 (emphasis

in original and internal citations omitted).

Here, the district court correctly followed this functional, practical approach and properly concluded that Flood "'direct[ed] his efforts toward the consummation of a sale'" in that he "'obtain[ed] a commitment to buy' from those residents he convinced to use Just Energy's services." JA002906. Flood characterized himself as a "salesman" and agreed that he was responsible for soliciting new customers to obtain their gas and electricity services from Just Energy. JA000216, JA000222, JA000250, JA000253, JA000306-09, JA000414-15; *see also* JA002267-71. Therefore, the court concluded that Flood's primary duty was "making sales" within the meaning of the exemption:

> It is clear that Flood was an outside salesperson: when he knocked on doors, he was responsible for culling potential customers from ineligible residents; he, and only he, attempted (quite often successfully) to sell them energy services; and the record indicates that, once the residents signed up for Just Energy's services, defendants did little other than make sure there were no technical or legal issues with processing the contracts. Accordingly, there is no genuine dispute that Flood's primary duty was "making sales."

JA002906.

As the district court properly noted, even if Flood did not "make sales," he nonetheless obtained orders or contracts for services within the meaning of the exemption. JA002907. Rejecting Flood's nonsensical argument that he was selling commodities – gas and electricity – and, therefore, not obtaining orders for

contracts or services, the district court reasoned that in New York, the sale of electricity is a "service." *Id., citing Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.,* 163 F.3d 153, 155 (2d Cir. 1998); *United States v. Consol. Edison Co.,* 590 F.Supp. 266, 269 (S.D.N.Y. 1984); N.Y. Gen. Bus. Law §349-d. *See also Hudson Energy Servs., LLC v. A&P (In re: A&P)*, 498 BR 19 (S.D.N.Y. Sept. 16, 2013) (electricity is not a good but a service). Accordingly, the court properly held that Plaintiff's primary duty was obtaining contracts within the scope of the outside sales exemption.

### C. External Indicia of Sales Also Support the District Court's Finding that Flood Was an Exempt Outside Salesperson.

#### 1. Just Energy Need Not Satisfy All the External Indicia of Outside Sales for the Exemption to Apply.

The district court properly found that there were no genuinely disputed issues of material fact as to whether Flood bore the "external indicia" of an outside salesperson. In deciding borderline cases or as a means of establishing further support for application of the outside sales exemption, courts sometimes look to external indicia of sales, a non-exhaustive and non-dispositive list of factors that tend to suggest someone is engaged in outside sales. These "indicia of sales" may include whether the individual was compensated on a commission basis; whether the position was advertised as a sales job or if the individual had prior sales experience; whether the company offered specialized sales training; whether the

individual was responsible for soliciting new business for the company; and whether the individual was constantly and directly supervised. *Chenensky v. New York Life Ins. Co.,* 2009 U.S. Dist. LEXIS 119549 (S.D.N.Y. Dec. 22, 2009); *Nielsen v. DeVry, Inc.,* 302 F.Supp.2d 747, 756-758 (W.D. Mich. 2003).

Flood incorrectly argues that *in addition to demonstrating that he performed exempt outside sales work under the statute and regulation,* Just Energy must *also* show that he bore "other indicia" of outside sales. Brief of Appellant at 38. As a preliminary matter, it was not necessary for the lower court – nor is it necessary for this Court – to even consider external indicia of sales. Flood offers *no authority* for his suggestion that an exempt outside salesperson must *also* meet the external indicia of sales where it is otherwise clear that he falls within the exemption. Rather, courts tend to look to the external indicia of sales for guidance only when the plaintiff's duties do not squarely fit within the statutory or regulatory language and as "further support" when the application of the exemption is questionable. As the district court correctly noted, "other courts in this Circuit generally have looked to such indicia 'to assist in the adjudication of 'mixed duties' cases, where the employees engage in sales and also perform a significant amount of non-sales work…In such cases, the question is not – as it is here – whether the employees make sales at all, but whether their work *primarily* consists of making those sales." JA002906; *see also Amendola v. Bristol-Myers Squibb Co.,* 558 F.Supp.2d 459,

471-72 (S.D.N.Y. 2008); *Hantz v. Prospect Mortgage, LLC,* 11 F.Supp.3d 612, 619 (E.D. Va. 2014) (because mortgage loan officers qualified for the outside sales exemption based solely on the two factors provided in the regulation, court declined to further analyze other external indicia).

For instance, in *Christopher,* the Supreme Court grappled with the question of whether pharmaceutical sales representatives who could obtain only "non-binding commitments" from physicians to prescribe certain drugs to their patients qualified for the outside sales exemption. Recognizing this "non-traditional" arrangement, the Court cited several external indicia of sales as "*further support"* for its finding that the plaintiffs in *Christopher* performed exempt outside sales work. *Christopher*, 132 S.Ct. at 2172 (emphasis added). *See also Dailey,* 2015 U.S. Dist. LEXIS 97103 at *15 ("external indicia are only a guide in the interpretation of the outside salesperson exemption"); *Nielsen,* 302 F.Supp.2d at 758 ("circumstantial indicia" merely "strengthen[ed] the conclusion" that the plaintiffs' activities constituted making sales or obtaining orders or contracts for services as required by the regulation); *Lane v. Humana Marketpoint, Inc.* 2011 U.S. Dist. LEXIS 59608 (D. Idaho June 3, 2011) (court considered external indicia to resolve dispute as to whether sales or customer service constituted health benefit and insurance products sales representatives' primary duty); *Schaefer-Larose v. Eli Lilly and Co.,* 663 F.Supp.2d 674, 685, 687-688 (S.D. Ind. Sept. 29, 2009), *aff'd,*

679 F.3d 560 (7th Cir. 2012) (where exemption is "a closer question," indicia of sales analysis "helps" determine whether sales work is an employee's primary duty and the indicia "buttress[ed]" the court's conclusion that pharmaceutical representative's duties comported with the outside sales exemption); *Baum,* 605 F.Supp.2d at 683-684 ("Such indicia of sales *confirm* the regulation's requirement that the employee be 'employed for the purpose of and … customarily and regularly engaged' in making sales or obtaining orders" and describing indicia of sales as "adjunctive support" for the exemption).

Given that Flood's undisputed job duties fall squarely within the regulatory definition of exempt outside sales, Flood's undue emphasis on the importance of external indicia misses the mark.

### 2. The District Court Correctly Concluded That Flood Bore Most of the Indicia of Outside Sales and the Rest Were, At Most, Neutral.

In any event, the district court correctly reasoned that – to the extent external indicia of sales could or should be considered – the factors did not create a triable issue of fact. JA002906. Flood had prior sales experience, was paid on a commission basis, worked away from the Just Energy office, and received sales training. *Id.* While noting that Just Energy exercised some level of control or direction over Flood's work activities, the court agreed with *Dailey's* conclusion that this external indicia was neutral, at most, as applied to Flood and that "some

supervision [is not] irreconcilable with the outside sales exemption." JA002906-07.

**a. Flood Was Paid on a Commission Basis.**

Flood was compensated on a 100% commission basis, earning commissions "based directly on sales he had made." JA002905-65, JA000252. "Compensation based wholly or in significant part on commission correlates with a finding that the employee does sales work." *Nielsen,* 302 F.Supp.2d at 757. Further amplifying the incentive-based nature of Just Energy's commission system, Flood was "motivated to work" because the more sales he made, the more money he earned. JA000169-70. Unlike the plaintiffs in *Hurt* and *Wilkins v. Just Energy Group, Inc.,* 308 F.R.D. 170 (N.D. Ill. 2015), but very much like the plaintiff in *Dailey,* Flood was a "top producer" and was well-compensated during his time working with Just Energy. JA000162, JA000354. Accordingly, this external indicia supports that Flood was an outside salesman.

**b. Flood Solicited New Business for Just Energy.**

Although Flood argues that he was directed which neighborhoods to work and which doors to knock on, Flood cannot dispute that he was responsible for soliciting new customers for Just Energy. JA000037-38, Brief of Appellant at 9. Flood unequivocally testified that he was not provided with "leads" and that he "developed all customers, whether they were residential or commercial, on [his]

own." JA000222. When he interacted with customers at their homes, he identified himself, explained why he was there and that he represented Just Energy. JA000294. Flood testified that it was important that he understood the products he was selling and that his role was to "sell the product that [customers] need." JA000218-19. Convincing residents to become customers and obtain their gas and electricity from Just Energy was unquestionably Flood's aim and responsibility and, accordingly, this indicia supports the outside sales exemption.

#### c. Flood Was Afforded Sales Training.

Just Energy provided specialized sales training during the orientation sessions Flood attended, by allowing Flood to shadow another salesperson in the field, and through ongoing training during morning sales team meetings. JA000038, JA000044, JA000090, JA000092, JA000251-59, JA000271-72. Flood described the daily meetings as "motivational, educational or instructional" and that he took notes "all the time" as they reviewed he "do's and don'ts" of selling in the regulated energy industry. JA000171, JA000258-59.

Indeed, Just Energy's Orientation Manual (JA002428-2515) demonstrates the level and type of sales training afforded to Flood and the opt-in plaintiffs. On its opening pages, the manual welcomes workers to the "Profession of Sales!" JA002431. The manual educates workers on the products and services they are selling. In addition, the manual also contains material designed to help Just

Energy's door-to-door workers become more successful salespeople, containing detailed information on how to best introduce themselves to customers, obtain a copy of the customer's utility bill, to educate the customer on Just Energy's programs, and respond to customer objections. JA002469-70, JA002481-84.

In *Nielsen,* the plaintiffs underwent training upon joining DeVry, learning about DeVry's educational programs and techniques for meeting prospective applicants and persuading them to apply to DeVry. "These facts reflect DeVry's efforts to train its field representatives in the art of sales." *Nielsen,* 302 F.Supp.2d at 757. Likewise, Flood's own deposition testimony and Company training materials amply demonstrate that he and the opt-in plaintiffs were offered specialized sales training, further supporting that he was engaged in sales work. JA000171, JA000251-59, JA000271-72.

**d. Flood Had Prior Sales Experience.**

Flood considered himself to be a salesman and he understood at the time he engaged with JEMC that the job entailed selling energy door-to-door. JA000208-09, JA000212-16, JA000250, JA000252, JA000292, JA000415. Flood brought prior sales experience to the Company, having previously sold insurance and other financial services. *Id., see also* JA000157-58. While Just Energy did not necessarily require prior sales experience and while labels, of course, are not dispositive, "[a]n employee is more likely to be considered engaged in sales if the

job was advertised as a sales position and the employee was recruited based on sales experience and abilities." *Nielsen,* 302 F.Supp.2d at 756. *See also Baum,* 605 F.Supp.2d at 683 (plaintiff referred to her job as a sales job). Flood's prior sales experience further supports a finding that the outside sales exemption applies.

**e. The Degree of Control Just Energy Exercised Over Flood Was Not Inconsistent With – and Did Not Defeat – the Outside Sales Exemption.**

Ignoring the totality of the circumstances, Flood focuses on a single indicia – supervision – in an effort to defeat the outside sales exemption. In addition to complaining that Just Energy instructed Flood and the opt-in plaintiffs as to when to work, where to work, what materials to use and what apparel to wear, in a further effort to confuse the issues – and perhaps garner the Court's sympathy – Flood complains that he worked long hours and often worked in inclement weather or knocked on doors in high crime areas. As the district court held, this level of supervision is not inconsistent with the outside sales exemption, just as the challenges Flood faced in his daily duties comport with outside sales work, which, as Flood agreed, "is not an easy job." JA000446.

As the district court correctly found, none of the indicia of sales should be viewed in isolation and some level of supervision is not irreconcilable with the outside sales exemption. JA002907. Aside from the misplaced reasoning in *Hurt*, Flood offers no other legal support for his position that the level of supervision and

control Just Energy exercised precludes application of the outside sales exemption.

In *Jewel Tea Co. v. Williams,* 118 F.2d 202, 203 (10th Cir. 1941), the court held that a door-to-door salesman qualified for the outside sales exemption even though the plaintiff, not unlike Flood, was supervised and monitored. He was assigned a specific territory and transported himself in a company vehicle; he was expected to visit customers on a regular schedule and was even told which customers to visit on which days; he had a quota regarding obtaining new customers each week; he was required to work a set schedule of hours; and he was otherwise instructed "to devote [his] entire time and best efforts" to the company. *Id.* at 203-205. He generally worked alone in the field, but traveled with a sales manager several times and his supervisor monitored his progress. *Id.* at 204. Plaintiff also attended bi-weekly meetings for further instruction and discussion of sales problems and new sales programs. *Id.* Notwithstanding this level of direction and control, the court still held that the plaintiff qualified for the outside sales exemption.

Likewise, in *Nielsen,* the exempt field representatives were provided handbooks containing scripts to follow when speaking to potential applicants and were required to meet quotas and benchmarks and report to their supervisors regularly. *Nielsen,* 302 F.Supp.2d at 747.

In *Schaefer-Larose,* the court found that the outside sales exemption was established, despite the level of supervision the employer exerted. The plaintiff, a pharmaceutical representative, contended that Lilly provided her with a tiered list of specific physicians to visit and that she had no discretion to determine how frequently to visit each physician or which products to target. *Schaefer-Larose,* 663 F.Supp.2d at 679. She claimed that her district manager had to approve her routing schedule and that the demands her supervisors placed on her required her to work up to 90 hours per week. *Id.* In addition, district managers participated in "ride alongs" to monitor the plaintiff's performance and the plaintiff was further required to submit detailed reports and participate in conference calls with her district managers regularly in which her work performance and proposed changes in messaging were discussed. *Id.* at 679-680. The plaintiff also claimed that any changes to her approach to physicians had to be approved by her district manager and were subject to the company's "strict policies and procedures." *Id.* at 680. Like Flood, Schaeffer-Larose also asserted that, when promoting products to physicians, "she was limited to using pre-approved scripted messages written by Lilly." *Id.* The court analyzed the various indicia of sales and found the plaintiff to be an exempt outside salesperson, even in the face of this level of supervision. *Id.* at 684, 688.

In *Lane,* the sales representatives also attended regular sales meetings with their managers; used company-provided and company-approved materials in their sales calls; were required to work specific and fixed hours at assigned retail locations (where they were required to sign in and out); were required to check in at their area sales office, provide daily reports and attend mandatory meetings; and otherwise submit bi-weekly timesheets accounting for their activities. *Lane,* 2011 U.S. Dist. LEXIS 59608 at *5, 8-11. The court found "requiring that employees meet certain quotas or report their activities does not defeat an outside sales exemption finding." *Id.* at *25, *citing Nielsen,* 302 F.Supp.2d at 758.

Similarly, in *Baum*, a pharmaceutical representative was trained in her employer's "Interactive Strategic Selling" (ISS) model, which she followed in interacting with physicians, along with a script provided by the company, which she described as "the same canned speech;" she passed physician questions on to AstraZeneca's central office for guidance on a response; and she utilized pre-approved company materials while calling on physicians, such as visual aids and package inserts. *Baum,* 605 F.Supp.2d at 671-673. The plaintiff was expected to work during all regular work hours and was required to notify her manager if she needed time off. *Id.* at 672. The company required her to adhere to a strict regimen with relation to note taking and checking messages. *Id.* Her manager tracked her daily activities, periodically accompanied her on calls and assessed her

performance. *Id.*

In considering the indicia of sales on these facts, the court concluded that the plaintiff satisfied the outside sales exemption. Despite the plaintiff's arguments that she followed strict guidelines regarding what she did with her time, the court nonetheless found that she "was not substantially supervised." *Id.* at 684. With regard to the use of pre-approved scripts, in particular, the court noted that "even if initially planning to work from prepared scripts, [the plaintiff] inevitably varied her presentation to effectively appeal to a particular physician." *Id.* at 683.

Similarly, in the present case, Flood acknowledged that the sample scripts Just Energy provided were a "guideline" (JA000392) and that he tailored his approach to different customers, using graphs not prepared by Just Energy and adding details not contained in Just Energy's prepared script:

> Q. So these types of explanations, which I think are very clear to me, thank you –
>
> A. You're welcome.
>
> Q. -- would you go into this level of detail with people at the door?
>
> A. Every time.
>
> Q. Was this level of detail on your script?
>
> A. Nope.
>
> Q. So tell me why you changed the script.

A. I didn't change, I added.

***

Q. So you're saying you kept to, at the minimum, the script, but you added, you enhanced the script?

A. I improved it. I added to it and I improved it; because it's more in detail and it helps people understand where their money goes.

JA000301-04.

Flood, therefore, is not unlike the sales representatives found to be exempt in *Nielsen, Lane, Schaefer-Larose* and *Baum.* All employees in the modern workplace are subject to some level of supervision, monitoring and company-mandated requirements; the sales industry is no exception. The expectation that salespeople work regular and defined hours, follow company guidelines or use prepared and pre-approved materials or scripts does not create a level of supervision incompatible with the outside sales exemption. As the court observed in *Nielsen,* "'[t]he nature and scope of an employee's supervision is *another* relevant factor. An employee who receives little or no *direct or constant* supervision in carrying out daily work tasks is more likely to be considered engaged in sales." *Nielsen,* 302 F.Supp.2d at 758 (emphasis added). This language not only highlights that the level of supervision is *just one, non-dispositive factor*, it also suggests that some level of supervision is not incompatible with the exemption. To hold otherwise simply ignores the realities of

the modern workplace in general and the sales industry in particular.

At worst, as the *Dailey* court and the district court held, the prior experience and level of supervision indicia are "neutral" and do not compel a finding that the exemption does not apply. JA002907. As the court in *Dailey* registered, "there is no dispute that Plaintiff was not directly supervised while she was out in the field, though the extent of any indirect supervision remains up for debate. Taken as a whole, the external indicia of outside sales activity traditionally applied in the FLSA context are neutral…Therefore, the Court finds that these external indicia do not conflict with its finding that there is no genuine dispute of material fact that Plaintiff's job activities constituted 'selling' or 'obtaining orders or contracts…for services…" *Dailey,* 2015 U.S. Dist. LEXIS 97103 at *16. The level of supervision Just Energy exercised is not incompatible with the outside sales exemption.

### D. The Law Does Not Require that an Outside Salesperson Have Authority to Bind the Company or Finalize A Sale for the Outside Sales Exemption to Apply.

A sale does not have to be final at the door in order for the exemption to apply. Flood's contention to the contrary and focus on Just Energy's ability to reject or cancel a sale has no basis in the law. The terms "sales" and "orders or contracts" under the FLSA are not qualified by words such as "binding," "irrevocable," "final" or "consummated." "[W]hen an employee who has extended

an offer to sell obtains a 'firm commitment to buy,' that transaction amounts to a 'contract to sell.'" *Christopher,* 132 S.Ct. at 2171, n.20. In *Christopher*, the Court reasoned that pharmaceutical representatives – who at best could obtain only "non-binding commitments" from physicians to prescribe drugs – fell within the scope of the exemption. "[An employee] who obtains such a commitment is 'directly involved' in this transaction. Thus, once a pharmaceutical sales representative and a physician have fully completed their agreement, it may be said that they have entered into a 'consummated transaction.'" *Christopher,* 132 S.Ct. at 2166, n.12.

It is widely accepted that the lack of authority to fully and finally "consummate" a sale is not required under the outside sales exemption. For instance, in *Brody v. AstraZeneca Pharmaceuticals, LP,* 2008 WL 6953957, *5 (C.D. Cal. June 11, 2008), the court rejected the argument that the lack of authority to "consummate" a sale renders the work performed non-exempt. The court reasoned that the exemption merely requires "selling" and not the specific "consummation of sales." *Id.* "[E]ven though Plaintiff never consummated sales himself, such sales were nevertheless considered 'his own' in that sales were tracked within his geographical area and Plaintiff received incentive awards based in part on changes in market share in his area. Accordingly, Plaintiff 'engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling.'" *Id.* at

*8, *quoting* 1949 Weiss Report at 83.

All that is required is that Flood directed his efforts toward his own sales – *and not those of others* – regardless of whether or not the customer or company could theoretically cancel a signed contract. "If an employee 'does not consummate the sale *nor direct efforts toward the consummation of a sale*, the work is not exempt outside sales work.'" *Slow v. Prestige Merchandising Co., Inc.,* 2011 U.S. Dist. LEXIS 105517 (E.D.N.Y. Sept. 19, 2011) (emphasis added).

Here, Flood was not a mere canvasser. He directed his efforts toward his own sales, not those of others. He was the "last salesperson" to interact with the customer and no other salesperson followed to close the deal. JA000415, JA000447. As the district court aptly noted, "[i]f he was not making the sale, who was? No one? This makes no sense. Indeed, he was paid *commissions* based directly on sales he had made. The proof is in the pudding, so to speak." JA002904-05 (emphasis in original).

Relying on the *Hurt* court's flawed analysis that a signed customer contract did not become a "contract" until Just Energy actually accepted it, and, therefore, there could never be any sale, Flood baldly answers the district court's question that "Just Energy makes the sale." Brief of Appellant at 34. This is nonsense and exults form over substance – precisely what *Christopher* and its progeny have instructed lower courts *not* to do. Flood was not furthering anyone else's sales

efforts and no one else had any contact with the customer that was directed toward furthering the sale. JA000415, JA000447.

In *Schaefer-Larose,* the court found that the FLSA does not require "a final sale. … Courts have recognized that 'the touchstone for making a sale, under the Federal Regulations, is *obtaining a commitment*.'" *Schaefer-Larose,* 663 F.Supp.2d at 686, citing *Clements v. Serco, Inc.,* 530 F.3d 1224, 1227 (10th Cir. 2008) (emphasis added). *See also Baum,* 605 F.Supp.2d at 679 ("statutory language does not require a final sale, complete and consummated.").

*Baum* recognized that not all "commitments" obtained – in any industry[4] – would necessarily result in a complete and finalized sale for legal tender. However, that possibility did not defeat the exemption where common sense dictates that the employee's duties fall within the exemption:

> For instance, where a hypothetical Mr. Loman sells a widget, but the widget is ultimately returned six months later under a warranty claim, did a sale actually occur? Was the sale binding? Given this country's aggressive implied warranty laws, is any sale ever binding?

*Baum,* 605 F.Supp.2d at 681-682. Here, Flood obtained much more than a "non-

[4] Despite differences in their industries, pharmaceutical representatives' and Flood's and the opt-in plaintiffs' duties are analogous: Both direct their efforts toward persuading a customer to purchase their employers' products or services and they are compensated based on their successful efforts. *See, e.g., Dailey v. Just Energy Marketing Corp.,* 2015 U.S. Dist. LEXIS 97103, *9 (N.D. Cal. July 23, 2015).

binding" commitment. He obtained customers' signatures on contracts – the epitome of a "commitment." Yes, those contracts might ultimately be cancelled or rejected for any number of non-arbitrary reasons, but it is enough for a sale to have occurred for Plaintiff to have obtained a "commitment" vis a vis a signed contract.

Notably, although Plaintiff argues that Just Energy retained "unfettered discretion" to reject a customer, *the record is devoid of evidence of a single instance in which Just Energy arbitrarily rejected a sale*. JA000381, JA000447. While Flood asserts that one in twenty contracts were arbitrarily rejected (Brief of Appellant at 19), he actually testified that a mere one in twenty contracts might be subject to rejection by the utility for non-arbitrary, credit-related reasons. JA000371. This does not create an issue of fact. Moreover, a company's ability to rescind an agreement does not mean that a plaintiff does not "make sales" or "obtain contracts" within the meaning of the FLSA. "Selling" need not involve the literal execution of contracts:

> Adopting Plaintiff's argument would exalt form over substance. "If an employee directs his efforts at persuading a particular customer to purchase a product and is compensated on the basis of his success in doing so then the employee is clearly engaged in sales activity and not mere general promotion of the product….This is particularly so when…it has not been alleged that any other employee will affirmatively make further contact with the customer to consummate the sale."

*Dailey,* 2015 U.S. Dist. LEXIS at *8-9, *citing Barnick v. Wyeth,* 522 F.Supp.2d 1257, 1264-65 (C.D. Cal. 2007).

While the courts in *Hurt* and *Wilkins* sorely misread the law, the remaining the cases on which Flood relies to support his argument that a sale must be "fully consummated" are distinguishable. In sharp contrast to the present case, the plaintiffs in *Wirtz v. Keystone Readers Serv., Inc.,* 418 F.2d 249 (5th Cir. 1969) were door-to-door "student salesmen" who made "*the first contact* on a house-to-house canvass" on behalf of a magazine subscription company. *Wirtz*, 418 F.2d at 252 (emphasis added). The student salesmen told prospective customers that they could receive four magazine subscriptions for a mere 41 cents per week and if the prospect expressed an interest, he completed an order card, which the student, in turn, submitted to a manager. *Id.* Critically, the students were prohibited from answering specific questions about pricing or billing and were instructed to tell the prospective customer that "someone else" would be in touch to obtain their final signature. *Id.* Thereafter, a *manager* – not the student – followed up and, in a classic "bait and switch," attempted to upsell the prospective customer on a more expensive, accelerated plan that contained starkly different terms than outlined by the student salesmen. *Id.* If the customer agreed to these *new and different* terms as outlined by the manager, *then* the customer signed a final and binding contract, which always replaced the initial order card. *Id.* at 252-253. In fact, the defendant

in *Wirtz* would not accept a subscription order on the terms explained by the student salesperson and contained on the initial order card, even if the customer requested those terms. *Id.* at 253. Thereafter, the defendant compensated the managers, not the students, for the completed sale. *Id.* On these very specific facts, the court concluded that the "student salesmen" did not qualify for the FLSA's outside sales exemption. *Id.* Here, it is undisputed that customers signed the contract Flood persuaded them to sign; no other salesperson contacted the customer to "upsell" or otherwise alter the contract's terms; and Flood – and no one else – earned commissions on his successful contracts.

Likewise, in *Clements*, the plaintiffs, military recruiters, "were more analogous to buyers than sellers," and therefore, did not qualify for the outside sales exemption. *See Christopher,* 132 S.Ct. at 2174 (distinguishing military recruiters in *Clements* from exempt outside salespeople). The *Clements* court explained that the military recruiters were selling the Army's services "[i]n a loose sense" and that the targeted recruits were not actually *buying* anything. The practical result was that the Army, not the recruit, was the actual buyer in that the Army would eventually pay for the enlisted recruit's services, not the other way around. *Clements,* 530 F.3d at 1229-1230, n.4, *cited in Christopher*, 132 S.Ct. at 2174.

The court in *Clements* was also persuaded the recruiters at issue, unlike the sales representatives in *Christopher* and unlike Flood, did not even obtain commitments *of any kind* from the recruits, reasoning that "[t]he touchstone for making a sale, under the Federal Regulations, *is obtaining a commitment.* This can be done by making a sale or obtaining an order or contract for services." *Id.* at 1227-1228 (emphasis added). Indeed, the court noted that the military recruiters were more akin to the student salesmen at issue in *Wirtz*, "paving the way" for someone else – in that case, the United States Army – to eventually "sell" the targeted recruit on the idea of joining the Army and obtaining his or her enlistment. *Id.* In contrast, "an employee is involved in exempt sales activities if he consummates a sale, directs his activities toward consummating a sale that he himself makes, *or obtains orders or commitments* from a purchaser." *Nielsen,* 302 F.Supp.2d at 759.

In the present case, Plaintiff was not "paving the way" for another salesperson to close the deal, nor was he gathering a list of prospects interested in the "concept" of changing gas or electricity suppliers. Plaintiff unequivocally testified that he developed all his customers on his own, no one followed him to complete the sale and that, in fact, he was the "last salesperson to touch the customer." JA000222, JA000415, JA000447.

Against this backdrop of supporting case law, the courts in *Hurt* and *Wilkins* incorrectly construed the exemption as requiring a final and consummated sale to occur in order for the exemption to apply. Rather, the court in *Dailey* had the better reasoning:

> The Court finds that *Hurt* and *Wilkins* do not dictate the result here for several reasons. First, the *Hurt* court considered only whether the plaintiffs "ma[de] sales" under FLSA and did not further analyze whether those plaintiffs obtained orders or contracts. Second, while the Illinois law applied in *Wilkins* is similar … the *Wilkins* court appears to have added a requirement that the orders or contracts be "consummated" in order to satisfy the outside salesperson exemption. Consistent with its analysis above, the Court declines to read this additional requirement into the exemption.

*Dailey,* 2015 U.S. Dist. LEXIS 97103 at *13 (footnote omitted).

Requiring that an exempt outside salesperson have the ability to fully and finally consummate a sale at the customer's door is not rooted in the language of the Act, regulations or case law and, quite frankly, defies common sense. It is well-settled that a salesperson need only be in a position to obtain a "commitment" from a customer to purchase his employer's products or services to satisfy the exemption – precisely what Flood did. Accordingly, the district court correctly granted summary judgment to Just Energy.

## III. <u>THE DISTRICT COURT CORRECTLY RULED THAT ISSUE PRECLUSION DID NOT BAR AN AWARD OF SUMMARY JUDGMENT TO JUST ENERGY.</u>

The ongoing litigation in *Hurt* cannot serve as the basis for issue preclusion. The following criteria must be satisfied before issue preclusion applies:

- The issues in both proceedings must be identical;
- the issue in the prior proceedings must have been actually litigated and decided;
- there must have been a full and fair opportunity for the litigation in the prior proceeding; and
- the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991). "'Collateral estoppel is an equitable doctrine – not a matter of absolute right. Its invocation is influenced by considerations of fairness in the individual case.'" *In re American Express Anti-Steering Rules Antitrust Litigation,* 2016 U.S. Dist. LEXIS 3332, *73 (E.D.N.Y. Jan. 7, 2016), *quoting PenneCom B.V. v. Merrill Lynch & Co.,* 372 F.3d 488, 493 (2d Cir. 2004). A trial court "should not apply the doctrine where doing so would be unfair to a defendant." *Id., citing Parklane Hosiery,* 439 U.S. at 331.

While *Hurt* involved whether door-to-door workers engaged by Defendant JEMC to sell energy on behalf of another Just Energy affiliate (Commerce Energy) performed exempt outside sales work, the facts and circumstances of Flood's engagement were not before that jury.[5] More importantly, the issue in the *Hurt* case has not been fully decided; there has not yet been a full and fair opportunity to completely litigate the matter; and, there is no final judgment.

### A. The Jury's Liability Finding in *Hurt* Is Not a "Final Judgment."

A "final judgment" for purposes of collateral estoppel requires an adequate opportunity for appellate review. *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008); *Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) ("Whether a judgment, not \`final' in the sense of 28 U.S.C. §1291, ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision ..., the adequacy of the hearing, and the opportunity for review.").

[5] Flood misconstrues Just Energy's "admission" that the facts of this case are "identical" to *Hurt.* Just Energy conceded that the plaintiffs in *Hurt* (and *Dailey)* performed similar jobs for related Just Energy-entities, but, as the district court found, the specific facts of *this* case were not before the *Hurt* jury. Critically, Flood readily admits that he was a "salesman," while the *Hurt* plaintiffs categorically denied that they "made sales." Also, the *Hurt* court erroneously instructed the jury, as the district court recognized (and those instructions will be challenged on appeal), the jury did not consider whether plaintiffs "obtained orders or contracts," which was central to the district court's finding here. JA002909.

It is unfair to preclude litigation if the party who would be bound by the prior determination had no opportunity for appellate review. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986), *cert. denied*, 480 U.S. 948 (1987). *See also LaBuhn v. Bulkmatic Transport Co.*, 865 F.2d 119, 122 (7th Cir. 1988) (an unappealable finding does not collaterally estop). "Relitigation of an issue is not precluded if the party against whom issue preclusion is sought could not as a matter of law have obtained review of the judgment in the initial action." *Warner/Elektra/Atlantic Corp. v. County of DuPage*, 991 F.2d 1280, 1282 (7th Cir. 1993).

The *Hurt* litigation is not yet concluded. The trial was bifurcated as to liability and damages, and the damages phase is ongoing. At the conclusion of the damages phase and upon entry of judgment from the district court, Just Energy intends to appeal. Because it has not yet had an ability to appeal the *Hurt* verdict, issue preclusion is not appropriate.

In a case *cited by Flood,* the court declined to apply collateral estoppel pending an appeal to the Second Circuit:

> [C]onsidering the current posture of the Government Decision and the court's discretion in determining whether to apply collateral estoppel, the court defers a resolution of the MP's motion for collateral estoppel until after the Second Circuit reaches a decision in the appeal of the Government Action. The MPs have not identified any case, nor is the court aware of any case, in which a district court gave preclusive effect to such a significant

> set of antitrust issues during the pendency of a merits appeal in the first-decided action. To apply collateral estoppel under such circumstances – even assuming each of the four elements were met as to each issue – would be unfair to Defendants. In addition, depending on the Second Circuit's resolution of the appeal of the Government Action, the application of collateral estoppel at this stage could, in fact, create inefficiencies.

*American Express,* 2016 U.S. Dist. LEXIS 3332 at *76-77. Additionally, *Mazzei v. Abbott Labs. & Co.,* 2012 U.S. Dist. LEXIS 46404 (E.D.N.Y. Mar. 13, 2012), is distinguishable. There, while the court recognized issue preclusion may foreclose a defendant from relitigating an issue it previously lost against another plaintiff, the jury verdict giving rise to application of collateral estoppel had been finalized and affirmed by the New York Court of Appeals. Here, Just Energy has not had the opportunity to appeal and it would be unfair and inefficient to give preclusive effect to a non-final decision on the controlling issue in this case.

Other cases Flood cites for the proposition that the *Hurt* verdict is "final" for purposes of issue preclusion are distinguishable. For instance, in *Alexander v. Chicago Park Dist.,* 773 F.2d 850 (7th Cir. 1985), *cert. denied,* 475 U.S. 1095 (1986), in noting that judgments not "final" for purposes of 28 U.S.C. §1291 can preclude further litigation *depending on* the nature of the decision, adequacy of hearing and *opportunity to review*, there was, in fact, an opportunity for review. The court order at issue did not technically comply with Rule 54(b), but the court ruled the order was still appealable. *Id.* at 855. *See also Avondale Shipyards, Inc.*

*v. Insured Lloyd's,* 786 F.2d 1265, 1269 (5th Cir. 1986) (distinguishing *Alexander,* stating, "[w]e are not aware of any federal appellate decision which has applied preclusion to a prior nonfinal ruling as to which appellate review was unavailable…"); *Dempsey v. Nat'l Enquirer,* 702 F.Supp. 927, 929 (D. Me. 1988) (distinguishing *Alexander* and finding res judicata did not apply where there was no Rule 54(b) certification).

Accordingly, because there has been no final judgment in *Hurt,* the district court did not abuse its discretion in declining to apply collateral estoppel.

**B. Other Inconsistent District Court Rulings Preclude Application of Collateral Estoppel.**

Offensive collateral estoppel should be applied in limited circumstances:

> [O]ffensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. … [With offensive collateral estoppel] … a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, [so] the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

*Parklane Hosiery,* 439 U.S. at 329-330 (internal citations omitted).

Even if *Hurt* were a final decision, the conflict among district courts on Just Energy's use of the outside sales exemption prevents application of collateral

estoppel in this case. In contrast to *Hurt*, but like the court below, the *Dailey* court analyzed the outside sales exemption with respect to some of the appellants in this case and also ruled that the exemption applied, granting summary judgment to Just Energy.[6]

Allowing Flood to invoke collateral estoppel and "cherry-pick" among conflicting decisions would not serve judicial economy and would be unfair to Just Energy. As the Supreme Court noted:

> [A] railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26… that offensive use of collateral estoppel should not be applied [in such a circumstance] so as to allow plaintiffs 27 through 50 automatically to recover.

*Parklane Hosiery,* 439 U.S. at 330, n.14. Courts consistently disallow this type of "cherry-picking." *See Hoppe v. G.D. Searle & Co.*, 779 F. Supp. 1425, 1427 (S.D.N.Y. 1991) (finding collateral estoppel inappropriate in light of inconsistent prior rulings); *Jack Faucett Associates v. American Tel. & Tel. Co.*, 744 F. 2d 118, 126 (D.C. Cir. 1984) (overturning district court and finding collateral estoppel does not apply because prior courts applied inconsistent analysis and reached opposite results in determining liability); *Setter v. A.H. Robins Co.*, 748 F.2d 1328, 1330

---

[6] Although *Dailey* analyzed the outside sales exemption under California law, the California statute, like the NYLL, does not differ in any meaningful way from the FLSA, so the analysis is the same. *See Vinole v. Countrywide Home Loans, Inc.,* 246 F.R.D. 637 (S.D. Cal. 2007), *aff'd,* 571 F.3d 935 (9th Cir. 2009).

(8th Cir. 1984) (upholding trial court's refusal to apply offensive collateral estoppel because defendant IUD manufacturer had prevailed in 12 of 21 prior cases); *Harrison v. Celotex*, 583 F.Supp. 1497, 1503 (E.D. Tenn. 1984) (refusing to allow collateral estoppel where there were prior inconsistent judgments); *Tretter v. Johns-Manville Corp.*, 88 F.R.D. 329, 333 (E.D. Mo. 1980) (refusing to invoke offensive collateral estoppel because it found that inconsistent judgments had been obtained with respect to defendant). Applying collateral estoppel would be manifestly unfair in light of *Dailey,* as the district court correctly recognized.

## IV. THE DISTRICT COURT APPROPRIATELY DISMISSED COUNT III OF FLOOD'S COMPLAINT WHERE HE WAS FOUND TO BE AN EXEMPT OUTSIDE SALESMAN AND WHERE HE OFFERED NO FACTS THAT JUST ENERGY FAILED TO PAY COMMISSIONS OWED.

Flood brought Count III of his Complaint pursuant to NYLL §191(1)(a) (JA0050), which applies to manual laborers, so the statute – and its corresponding seven-day wage payment rule – are not even applicable to Flood. Even assuming Flood meant to bring Count III under NYLL §191(1)(c) which is applicable to commissioned salespeople, this count, like the first two counts, was undeniably premised on Just Energy's alleged failure to pay minimum wage and overtime, not failure to pay timely commissions. Accordingly, upon ruling that the outside sales exemption applied and that Flood was not entitled to minimum wage or overtime, the district court properly dismissed Count III.

Yet, even if Flood's Complaint could be fairly read to include a claim for unpaid or untimely paid commissions – which it cannot – there is no dispute of material fact in this regard. The record is devoid of evidence that Just Energy failed to pay Flood for any commissions due and owing on successfully completed contracts. Although Flood *speculated* that Just Energy may not have paid commissions to him on certain customer contracts in which the customers did not qualify for the Company's "Predict-A-Bill" program, he could not point to a single specific instance in which that actually happened. JA000317-18. Indeed, Flood candidly stated, "How would I prove that? I don't know." JA000318.

Flood also asserts that Just Energy clawed back commissions on cancelled deals. JA000361, 000363. Undoubtedly recognizing that clawbacks are common in the sales industry, Flood testified that he did not have a problem with commissions being clawed back if a customer left within a year; he complained that the residual or "loyalty" payments he earned if they stayed longer than a year were not sufficiently large for his liking. "And this is my problem: The problem is that when people are on the books for the 13th month, you're only getting five percent as a renewal." JA000365. Flood also testified that if a customer called to cancel or change to a different program he did not introduce to the customer, the account was converted to a company account and Flood no longer received commissions. JA000371. But again, Flood could not point to a single instance in

which that happened. "There's no way to record that…" *Id.* Accordingly, there is no dispute of fact in this regard.

Even accepting the latter allegation that Flood's commissions were discontinued if a customer he obtained later contacted the company and opted to change to a different program, that does not alter the fundamental nature of his work, nor does it mean Just Energy improperly withheld commissions. His Agreement specifically contemplated such clawbacks or discontinuation:

> The Contractor is entitled to compensation for Effective Contracts that are not cancelled by the customer. The Contractor will be compensated for Effective Contracts according to the commission schedule in place at the time of submission of the Contract to JEMC, which schedule may be amended from time to time by JEMC in its sole discretion.
>
> …
>
> JEMC will offset against future commissions or collect through other means: (a) an amount equal to the commission advanced for a Contract that is subsequently determined not to be an Effective Contract; and (b) an amount equal to the commission advanced for any Effective Contract that is subsequently cancelled.

JA000508. Under NYLL §191(1)(c) – which Flood did not even plead – "commission salesmen are to be paid in accordance with the agreed terms of employment…Failure to establish a contractual right to wages necessarily precludes a statutory claim under New York's labor law." *Simas v. Merrill Corp.*, 2004 U.S. Dist. LEXIS 1415, *8 (S.D.N.Y. Jan. 29, 2004) (citations omitted).

Nothing in Flood's Complaint suggests that Count III was premised on anything other than a claim for minimum wage and overtime, and there is nothing to suggest that he intended to state a claim for failure to timely pay commissions. Indeed, he did not even plead the applicable statute! Moreover, the record is devoid of any evidence to establish that Just Energy failed to pay any commissions owed or inappropriately clawed back against earned commissions. Flood readily admitted that he has no records or other evidence to establish this unsupported claim. Accordingly, the district court appropriately dismissed Count III and awarded summary judgment to Just Energy on all counts.

## CONCLUSION

Just Energy may have provided supervision and exercised some element of control over Flood and his work assignments, instructing him when and where to knock on doors and providing sales scripts and other brochures for his use. Flood may have worked in undesirable neighborhoods on occasion or in inclement weather. Flood may have worked long hours. Some of the contracts Flood obtained may have been subject to rejection or cancellation for any number of legitimate, non-arbitrary reasons. But none of these factors defeat – or are even inconsistent with – the outside sales exemption.

The undisputed facts firmly established that Flood (and the opt-in plaintiffs) was engaged to knock on doors and solicit residents to sign contracts agreeing to

become customers of Just Energy – namely, to "make sales or obtain orders or contracts for services" within the plain language of the outside sales exemption. If any question remained as to whether the exemption applied, Flood bore many of the external indicia of outside sales: he worked in the field, away from Just Energy's place of business; he was responsible for soliciting new business for Just Energy; he was not directly supervised at the customer's door; and he was paid a commission for every successful contract he obtained. As the district court aptly noted, "If [Flood] was not making the sale, who was? No one? This makes no sense. Indeed, he was paid *commissions* based directly on sales he made. The proof is in the pudding, so to speak." JA002905 (emphasis in original).

Flood's collateral estoppel argument also fails. There is indisputably no final judgment yet in *Hurt* and Just Energy has not yet had an opportunity to appeal the verdict. As the district court concluded, the jury instructions in *Hurt* not only deviated from Second Circuit law on "making sales," the *Hurt* jury did not even consider whether those plaintiffs "obtained orders for contracts or services" under the FLSA and/or NYLL.

Finally, the district court correctly dismissed Count III of Flood's complaint, which stated a claim for unpaid minimum wage and overtime. Even if Flood's complaint could be construed as containing a claim for allegedly unpaid commissions, Flood merely surmised that he was not properly paid some

commissions, but he was otherwise unable to identify any contracts with any specificity on which he was allegedly unpaid. Accordingly, summary judgment in Just Energy's favor was proper.

For the foregoing reasons, Just Energy respectfully urges this Honorable Court to affirm the district court's award of summary judgment in its favor and dismiss this appeal in its entirety.

Respectfully submitted,

*/s/ Shannon K. Patton*
Shannon K. Patton
spatton@littler.com
**LITTLER MENDELSON, P.C.**
1100 Superior Avenue, 20th Floor
Cleveland, Ohio 44114
Telephone: 216.696.7600
Fax: 216.649.0541

Bradley A. Sherman
Bradley@shermanboseman.com
**SHERMAN BOSEMAN LEGAL GROUP, LLC**
800 West St. Clair Avenue, 4th Floor
Cleveland, Ohio 44113
Telephone: 216.647.1070

Ivan R. Novich
inovich@littler.com
**LITTLER MENDELSON, P.C.**
1085 Raymond Blvd., 8th Floor
Newark, New Jersey 07102
Telephone: 973.858.4705
Fax: 973.556.1661
*Counsel for Defendants-Appellees*
*Just Energy Marketing Corp., et al.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Local Rule 32.1(a)(4)(A) because it contains 12,327 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point, Times New Roman font.

*/s/ Shannon K. Patton*
Shannon K. Patton
spatton@littler.com
**LITTLER MENDELSON, P.C.**
1100 Superior Avenue, 20th Floor
Cleveland, Ohio 44114
Telephone: 216.696.7600
Fax: 216.649.0541

*Counsel for Defendants-Appellees*
*Just Energy Marketing Corp., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2017, I caused the foregoing Brief of Defendants-Appellees Just Energy Marketing Corp., Just Energy New York Corp. and Just Energy Group, Inc. to be filed electronically with the Clerk of Court using the United States Court of Appeals for the Second Circuit's CM/ECF system, through which this document is available for viewing and downloading, and which will send notice of such filing upon counsel of record for Plaintiffs-Appellants via electronic mail as follows:

Catherine E. Anderson
**GISKAN, SOLOTAROFF & ANDERSON, LLP**
2217 Center Street, 6th Floor
New York, New York 10013
E-mail: canderson@gslawny.com

Nicole T. Fiorelli
Patrick J. Perotti
Frank A. Bartela
**DWORKEN & BERNSTEIN CO., L.P.A.**
60 South Park Place
Painesville, Ohio 44077
E-mail: nfiorelli@dworkenlaw.com
pperotti@dworkenlaw.com
fbartela@dworkenlaw.com

*/s/ Shannon K. Patton*
Shannon K. Patton

Firmwide:149864826.1 071198.1044